**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MEGAN PERKINS,             )
                               )
               Plaintiff,   )
                               )     Civil Action No. 1:22-cv-05202
     v.                     )
                               )     The Hon. P. Kevin Castel
THE NEW YORK TIMES COMPANY, )
d/b/a *THE NEW YORK TIMES*,     )
                               )
              Defendant.  )
                               )

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**THE NEW YORK TIMES COMPANY'S MOTION TO DISMISS**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Karen A. Chesley
David McCraw
THE NEW YORK TIMES COMPANY
620 Eighth Avenue
New York, NY 10018
Tel: 800-698-4637
Email: karen.chesley@nytimes.com
Email: david.mccraw@nytimes.com

*Attorneys for Defendant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .........................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

    A.    Perkins Purchases a Subscription to The Times and Agrees to Its Automatic Renewal Clause. ................................................................................................2

    B.    Perkins Continues Her Subscription to The Times. ................................................5

    C.    Perkins Files Two Lawsuits. ................................................................................6

LEGAL STANDARD ..........................................................................................................7

ARGUMENT .......................................................................................................................9

I.    PERKINS'S N.C.G.S. § 75-41 CLAIM FAILS AS A MATTER OF LAW .....................9

    A.    The Times's Presentation of the Automatic Renewal Clause Was Clear and Conspicuous. ................................................................................................9

        i.    A Disclosure Is "Clear and Conspicuous" When a Reasonable Consumer Would Have Noticed and Understood It. ................................9

        ii.    Perkins's Own Allegations Show That a Reasonable Consumer Would Have Noticed and Understood the Automatic Renewal Clause. ................11

    B.    The Times's Presentation of the Cancellation Terms Was Clear and Conspicuous. ................................................................................................13

    C.    The Notification Required by N.C.G.S. § 75-41(a)(3)-(4) Does Not Apply to Monthly Subscriptions. ................................................................................16

II.    PERKINS FAILS TO STATE AN UNFAIR AND DECEPTIVE TRADE PRACTICES CLAIM ................................................................................................18

    A.    Perkins Has Not Alleged the Existence of an Unfair or Deceptive Trade Practice. ................................................................................................18

    B.    Perkins Has Not Alleged Proximate Cause. ................................................20

    C.    Perkins Is Not Entitled to Treble Damages Under N.C.G.S. § 75-16 ...................21

III.    PERKINS FAILS TO STATE AN UNJUST ENRICHMENT CLAIM. ..........................21

CONCLUSION ..................................................................................................................23

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allgood v. Wilmington Savs. & Trust Co.*,
    242 N.C. 506, 88 S.E.2d 825 (1955).............................................................................. 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................... 8

*Atl. Coast Line R.R. Co. v. State Highway Comm'n*,
    150 S.E.2d 70 (N.C. 1966).............................................................................................. 22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................................... 8

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
    No. 17-cv-04570, 2017 WL 7309893 (S.D.N.Y. Nov. 20, 2017)............................ 15

*Booe v. Shadrick*,
    369 S.E.2d 554 (N.C. 1988)............................................................................................ 20

*Braswell Egg Co. v. Poultry Mgmt. Sys., Inc.*,
    481 F. Supp. 3d 528 (E.D.N.C. 2020) .......................................................................... 14

*Bumpers v. Cmty. Bank of N. Va.*,
    695 S.E.2d 442 (N.C. 2010)............................................................................................ 21

*Cross v. Ciox Health, LLC*,
    438 F. Supp. 3d 572 (E.D.N.C. 2020) ................................................................... 19, 20

*Duncan v. Duncan*,
    742 S.E.2d 799 (N.C. 2013)............................................................................................ 21

*Fairstein v. Netflix, Inc.*,
    553 F. Supp. 3d 48 (S.D.N.Y. 2021) .............................................................................. 4

*Finn v. Barney*,
    471 Fed. App'x 30 (2d Cir. 2012)................................................................................ 4, 8

*Fort v. First Citizens Bank & Trust Co.*,
    526 F. Supp. 22 (M.D.N.C. 1981) ................................................................................ 11

*Fteja v. Facebook, Inc.*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012) .......................................................................... 14

ii

*Hardison v. Kia Motors Am., Inc.*,
   738 S.E.2d 814 (N.C. Ct. App. 2013) ............................................................... 11

*Holloway v. King*,
   161 Fed. App'x 122 (2d Cir. 2005) ...................................................................... 4

*Hubbert v. Dell Corp.*,
   835 N.E.2d 113 (Ill. App. Ct. 2005) .................................................................. 14

*In re Bassett*,
   285 F.3d 882 (9th Cir. 2002) ............................................................................... 9

*Krawiec v. Manly*,
   811 S.E.2d 542 (N.C. 2018) ............................................................................... 22

*Manoula, LLC v. Ohio Sec. Ins. Co.*,
   No. 21-cv-00718, 2022 WL 129322 (M.D.N.C. Jan. 13, 2022) ........................... 8

*McCabe v. Abbott Lab'ys Inc.*,
   47 F. Supp. 3d 339 (E.D.N.C. 2014) ................................................................. 22

*Meyer v. Uber Technologies, Inc.*,
   868 F.3d 66 (2d Cir. 2017) .......................................................................... 11, 14

*Noble v. Hooters of Greenville (NC), LLC*,
   681 S.E.2d 448 (N.C. Ct. App. 2009) ............................................................... 18

*Odell v. Legal Bucks, LLC*,
   665 S.E.2d 767 (N.C. Ct. App. 2008) ............................................................... 19

*Partita Partners LLC v. United States*,
   216 F. Supp. 3d 337 (S.D.N.Y. 2016) ............................................................... 10

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*,
   712 F.3d 705 (2d Cir. 2013) ................................................................................ 8

*Perkins v. Ark. Trucking Servs., Inc.*,
   528 S.E.2d 902 (N.C. 2000) ............................................................................... 10

*Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.*,
   712 S.E.2d 670 (N.C. Ct. App. 2011) ............................................................... 22

*Scott v. Palermo*,
   233 A.D.2d 869 (4th Dep't 1996) ...................................................................... 11

*Solum v. Certainteed Corp.*,
   147 F. Supp. 3d 404 (E.D.N.C. 2015) .......................................................... 20, 21

*Spruill v. Lake Phelps Volunteer Fire Dep't Inc.*,
    523 S.E.2d 672 (N.C. 2000) ........................................................................ 10

*Strubel v. Capital One Bank (USA), N.A.*,
    179 F. Supp. 3d 320 (S.D.N.Y. 2016) ......................................................... 9

*Sullivan v. Lab'y Corp. of Am. Holdings*,
    No. 17-cv-193, 2018 WL 1586471 (M.D.N.C. Mar. 28, 2018) ............... 23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..................................................................................... 8

*TufAmerica, Inc. v. Diamond*,
    968 F. Supp. 2d 588 (S.D.N.Y. 2013) ......................................................... 8

*Twentieth Century Fox Film Corp v. Marvel Enters., Inc.*,
    220 F. Supp. 2d 289 (S.D.N.Y. 2002) ......................................................... 4

*Waddell v. U.S. Bank Nat'l Assoc.*,
    395 F. Supp. 3d 676 (E.D.N.C. 2019) ....................................................... 18

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015) ......................................................... 4

**Statutes**

Cal. Bus. & Prof. Code § 17602(a)(1)-(3) ........................................................ 11

N.C.G.S. § 20-351 ............................................................................................. 11

N.C.G.S. § 25-1-201(b)(10) ................................................................. 9, 10, 13, 14

N.C.G.S. § 75-1.1 ........................................................................................... 18-21

N.C.G.S. § 75-16 ............................................................................................... 21

N.C.G.S. § 75-20 ............................................................................................... 19

N.C.G.S. § 75-29(b) .......................................................................................... 19

N.C.G.S. § 75-38(a) .......................................................................................... 19

N.C.G.S. § 75-39(c) .......................................................................................... 19

N.C.G.S. § 75-40(f) .......................................................................................... 17

N.C.G.S. § 75-41 .......................................................................................... passim

N.C.G.S. § 75-42(e) ........................................................................................................ 19

N.C.G.S. § 75-43(d) ........................................................................................................ 19

N.C.G.S. § 75-56(a) ........................................................................................................ 10

N.C.G.S. § 75-62(d) ........................................................................................................ 19

N.C.G.S. § 75-63(q) ........................................................................................................ 19

N.C.G.S. § 75-63.1(g) ...................................................................................................... 19

N.C.G.S. § 75-64(f) ......................................................................................................... 19

N.C.G.S. § 75-65(i) ......................................................................................................... 19

N.C.G.S. § 75-118(e) ...................................................................................................... 19

N.C.G.S. § 75-122 ........................................................................................................... 19

N.C.G.S. § 75-128 ........................................................................................................... 19

N.C.G.S. § 75-135(c) ...................................................................................................... 19

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................................. 8, 20, 21

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 1, 4

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ........................................................................ 10

Oxford English Dictionary (2021-22) ............................................................................ 10

U.C.C. § 1-201(10) .......................................................................................................... 10

Defendant The New York Times Company ("The Times") respectfully submits this Memorandum of Law in support of its Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) (the "Motion"). For the reasons set forth below, the Court should grant the Motion with prejudice.

## PRELIMINARY STATEMENT

For the second time, Plaintiff's counsel has brought these meritless claims alleging that The Times violated North Carolina's Automatic Renewal Statute (the "ARS"), N.C.G.S. § 75-41. As explained in The Times's pre-motion letter, counsel filed a virtually identical complaint in North Carolina in February 2022 on behalf of a client named "Sarah Perkins" and a putative class of Times subscribers. After The Times moved to dismiss, Plaintiff's counsel—apparently unhappy with the judge assigned to the case—voluntarily dismissed the complaint. They then renamed the plaintiff "Megan Perkins" (who is alleged to be identical in every way to "Sarah," but for her first name) and refiled the case in this Court. Plaintiff's forum shopping does not save her claims, which fail regardless of the venue in which she attempts to bring them.

The latest Complaint again alleges that, despite signing up for a monthly subscription to The Times, Perkins failed to understand that her subscription would automatically renew each month. There is no dispute that the relevant automatic renewal disclosures were presented to her when she subscribed, as shown by the screenshots in the Complaint. Nor is there any dispute that she necessarily agreed to these disclosed terms when she signed up. And there is no dispute that The Times provided Perkins with the services that it promised, including access to its vast online repository of original news reporting and commentary.

Instead, Perkins alleges that The Times's disclosures were insufficiently "clear and conspicuous" within the meaning of North Carolina's ARS, such that she did not receive adequate

1

notice about her subscription's automatic renewal terms and her ability to cancel.  That assertion, however, is belied by Perkins's screenshots of a webpage that is part of the subscription process (the "Checkout Page"), *see* Compl. ¶ 22, which show that The Times was completely upfront about its automatic renewal policies and her subscription's monthly cost.  Upon checkout, The Times told subscribers that their subscription would automatically renew, the current renewal rate, when that rate would expire, what the new rate would be, and when and how to cancel.  Those disclosures were "clear and conspicuous":  they employed language that was unambiguous, appeared in a prominent location where a reasonable consumer would notice them, and were distinguished from other contractual language.  And the other ARS violations that Perkins alleges are based on statutory provisions that expressly apply only to subscription periods that exceed 60 days—which Perkins's monthly subscription does not.  *See* N.C.G.S. § 75-41(3)-(4).

Perkins also again alleges that The Times engaged in unfair and deceptive trade practices, and that The Times was unjustly enriched by selling Perkins a subscription that automatically renewed when Perkins "did not intend to renew."  Compl. ¶ 68.  These claims fail because they are premised on the fallacy that Perkins was somehow misled into signing up for an automatically renewing subscription despite The Times's clear disclosures, and because Perkins fails to plausibly allege injury given that The Times provided her with the exact service that she paid for.

Given that Perkins does not and cannot allege a legally sufficient claim, the Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.    Perkins Purchases a Subscription to The Times and Agrees to Its Automatic Renewal Clause.

2

The Times publishes *The New York Times* in both print and online editions.  Compl. ¶ 2.

Plaintiff Megan Perkins, a North Carolina resident, alleges that on February 28, 2020, she used

The Times's website to purchase a monthly digital subscription.  *Id.* ¶ 34.

According to Perkins, potential subscribers like her are first asked to select a subscription

plan.  *Id.* ¶ 21.  After selecting an option, users "are directed to subsequent webpages on the NYT

Website and/or App where they are prompted to create a membership account and input their

billing information."  *Id.* ¶ 22.  The Complaint does not include these additional webpages, which

Perkins refers to as the "relevant screens and buttons" that appeared during the subscription

process.[1]  *Id.* ¶ 35.

Perkins alleges that, as part of the process for purchasing her subscription, she was directed

to a Checkout Page that included "relevant information regarding automatic renewal."  *Id.*  The

Complaint includes a minimized screenshot of a portion of the Checkout Page from April 6, 2020.[2]

---

[1] Although it need not be addressed at this stage of litigation, the heading on the Checkout Page shows that this webpage was part of a three-step subscription process, with the various steps titled "Account," "Billing," and "Confirmation."  Compl. ¶¶ 22, 32.  Perkins includes only a portion of the second page but omits everything else—including pages showing that the automatic renewal clause repeats during this sequence.  *See* Declaration of Karen Ann Chesley ("Chesley Decl."), ¶¶ 3-7.  Perkins also fails to mention that, in creating an account on the first page, a user must agree to The Times's Terms of Service.  *See id.* ¶ 4.  Those Terms of Service contain, among other things, a class action waiver.  Thus, this case not only fails on the merits—it is also doomed to fail as a class action.

[2] In using a screenshot from April 6, 2020 (a date with no significance to this litigation), Compl. ¶ 21 n.17, Perkins appears to have copied the allegations of a different person in a different putative class action.  *See Moses v. N.Y. Times Co.*, No. 20-cv-04658, D.E. 22, ¶ 31 n.17 (S.D.N.Y. Aug. 31, 2020) ("*Moses* FAC").  In fact, entire paragraphs of Perkins's allegations appear to have been copied—verbatim or with cosmetic changes only—from *Moses*.  *Compare* Compl. ¶¶ 1-2, 5, 12-18, 21-23, 41-44, 47-51, *with Moses* FAC ¶¶ 1, 4, 6, 11-16, 30-33, 62-64, 68-72.  Perkins's allegations also directly mirror the allegations from a class complaint against The Athletic, a subscription-based sports website owned by The Times, which has since been voluntarily dismissed.  *Compare* Compl. ¶¶ 41-51, 65-70, *with Leak v. Athletic Media Co.*, No. 22-cv-00084, D.E. 1, ¶¶ 15-25, 31-37 (N.D. Cal. Jan. 6, 2022) ("*Leak*").  Perkins does not acknowledge that the *Moses* or *Leak* pleadings form the basis of many of her allegations, which themselves are copied from the complaint her counsel filed—and then dismissed—in North Carolina earlier this year.

*Id*. ¶ 21 n.17.  A copy of the complete Checkout Page is set forth as Exhibit A to the Declaration of Karen Ann Chesley ("Chesley Decl.").[3]  As shown in the screenshot in the Complaint, the automatic renewal clause appears prominently on the Checkout Page:



---

[3] Because the Complaint relies heavily on the Checkout Page, *see* Compl. ¶¶ 21-23, 25-27, 31-32, 35, it is incorporated by reference.  *See Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 62 (S.D.N.Y. 2021) (Castel, J.) (incorporating the four-part series alleged to be defamatory); *Holloway v. King*, 161 Fed. App'x 122, 124 (2d Cir. 2005) (considering a contract that was "clearly incorporated by reference").  It is also subject to judicial notice.  *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) ("[A] court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination.") (citation omitted); *Finn v. Barney*, 471 Fed. App'x 30, 32 n.1 (2d Cir. 2012) (where "plaintiffs' own complaint quotes certain disclosures from the [defendants'] website, they cannot seriously argue that the website disclosures are 'outside of the pleadings'"); *Twentieth Century Fox Film Corp v. Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 296 n.9 (S.D.N.Y. 2002) (judicial notice of incorporated websites).

Compl. ¶ 22.  Thus, the Checkout Page discloses (1) that the user will be charged $4 every 4 weeks for the first year; (2) that the user will be charged a higher price every 4 weeks thereafter; and (3) that the "subscription will continue until you cancel," which can be done "anytime."  *Id.*

The Checkout Page also features a "Purchase Subscription" button that includes the following text directly above it:

> By subscribing, you agree to the Terms of Sale, including the Cancellation and Refund Policy. Your subscription will renew automatically, and you will be charged in advance. You may cancel at any time. The cancellation goes into effect at the start of your following billing cycle.

*Id.*  Perkins alleges, therefore, that The Times expressly informs potential subscribers like Perkins that the subscription "will renew automatically."  *Id.*  In addition, the subscriber's ability to "cancel at any time" is once again emphasized, and the text further explains that a cancellation goes into effect at the start of the next billing cycle.  *Id.*  And, by signing up, subscribers like Perkins must confirm their assent to The Times's Terms of Sale and Cancellation and Refund Policy (the "Cancellation Policy"), both of which are hyperlinked, as indicated by their rendering in bold blue font.  *Id.*; Chesley Decl., Ex. A.[4]  All of this information appears—as Perkins alleges— "immediately above" the button the user must click to proceed with the purchase.  *Id.*

## B.    Perkins Continues Her Subscription to The Times.

After signing up for a subscription, Perkins alleges that she initially paid a rate of $4 a month via PayPal.  *Id.* ¶ 34.  According to Perkins, around one year later, on February 24, 2021,

---

[4] As with the Checkout Page, the Cancellation Policy referred to in the Complaint and attached as Exhibit B to the Chesley Declaration, *see* Chesley Decl., Ex. B, is both incorporated by reference and subject to judicial notice.  Compl. ¶¶ 22, 26-27 & nn.18-19, 35; *see* n.3, *supra.*

her rate increased to $8 a month.[5]  *Id*. ¶ 38.  She alleges that, between February 28, 2020, and the filing of the Complaint, her subscription renewed 23 times.  *Id.* ¶ 40.

Perkins does not allege that The Times failed to provide her digital access to its website or that she never used her subscription.  She does not allege that she told The Times that she did not want her subscription to last longer than a single month, despite being told that it would continue until she cancelled.  She does not allege whether she clicked, or read, the Terms of Service or Cancellation Policy to which she agreed.

Tellingly, Perkins does not allege that she ever cancelled—or even attempted to cancel— her subscription.  On the contrary, Perkins's allegation that her subscription was renewed every month for nearly two years suggests that she remained a Times subscriber as of the date that she filed the Complaint.  *Id.*

**C.  Perkins Files Two Lawsuits.**

On February 23, 2022, Sarah Perkins brought an action in North Carolina state court claiming—both individually and on behalf of a putative class of similarly situated individuals— that The Times violated N.C.G.S § 75-41.  *See Perkins v. N.Y. Times Co.*, No. 22-cvs-002292, D.E. 1 (N.C. Sup. Ct. Feb. 23, 2022).  She also alleged that The Times's purported violations of Section 75-41 constituted unfair and deceptive trade practices, entitling her to treble damages, and claimed that The Times was unjustly enriched.  *Id.*  After The Times timely removed to federal court and moved to dismiss, Plaintiff's counsel voluntarily dismissed the complaint.

---

[5] The screenshot in Perkins's Complaint suggests that when she initially signed up, she was notified that her Times subscription would increase to $17 per month after a year.  Compl. ¶¶ 22, 32.  Thus, based on her own allegations, she was charged a monthly fee that was $9 ***less*** than she agreed to when she signed up.  Perkins does not mention, much less explain, this discrepancy.

On June 21, 2022, Plaintiff's counsel changed the Plaintiff's first name to "Megan" and refiled the same action in this Court with only a handful of minor cosmetic changes. Like "Sarah" Perkins, Megan Perkins claims—both individually and on behalf of a putative class—that The Times violated N.C.G.S. § 75-41, engaged in unfair and deceptive trade practices, and was unjustly enriched.[6]

Each of these claims is premised on Perkins's allegation that, despite the disclosures shown in her Complaint, she was "unaware that Defendant enrolled her in an 'automatic renewal' program under which the subscription would renew each month at varying rates unless [she] chose to cancel." *Id.* ¶ 37. She also alleges—despite multiple notifications that she could cancel her subscription at any time, the highlighted link to the Cancellation Policy (to which she agreed by subscribing), and the inclusion in her Complaint of a detailed description of NYT's Cancellation Policy (along with a link to a webpage where the information can be found) (*id.* ¶ 26 & n.18)—that she was unaware of "the full cancellation policy that applied to her purchase." *Id.* ¶ 35; Chesley Decl., Ex. A.

Because the basis for each of Perkins's claims is refuted by her own allegations, which no amendment can cure, The Times moves to dismiss this case with prejudice.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The

---

[6] This seems to be a familiar tactic for certain of Plaintiff's counsel, who recently voluntarily withdrew an automatic renewal lawsuit against Amazon in California after Amazon moved to dismiss. *See Nacarino, et al. v. Amazon.com, Inc.*, Case No. 3:22-cv-02713 (N.D. Cal. May 5, 2022). They then refiled the same claims (plus others) against Amazon in Washington. *See Daly v. Amazon.com, Inc.*, Case No. 2:22-cv-00910 (W.D. Wash. June 29, 2022).

plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While the Court "must accept as true all of the [factual] allegations contained in a complaint," it need not accept its "legal conclusions." *Id.* A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Naked assertions devoid of further factual enhancement" and "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" are insufficient. *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (citations omitted). Additionally, claims made under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") must be pled with particularity. *See Manoula, LLC v. Ohio Sec. Ins. Co.*, No. 21-cv-00718, 2022 WL 129322, at *14 (M.D.N.C. Jan. 13, 2022) ("The particularity requirements of Rule 9(b) also apply to UDTPA claims."); Fed. R. Civ. P. 9(b).

In ruling on a motion to dismiss, "courts must consider the complaint in its entirety," including "documents incorporated into the complaint by reference and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Where webpages are relied upon in a complaint, their contents may properly be considered at the pleading stage. *See Finn v. Barney*, 471 Fed. App'x 30, 32 & n.1 (2d Cir. 2012) (holding that pages of a defendant's website were subject to judicial notice where the plaintiff quoted them in its complaint). "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013).

## ARGUMENT

### I.   PERKINS'S N.C.G.S. § 75-41 CLAIM FAILS AS A MATTER OF LAW.

The Complaint takes a scattershot approach, claiming that The Times's subscription process violated ***all*** the provisions of N.C.G.S. § 75-41, in the apparent hope that volume will

compensate for the lack of merit.  Comp. ¶¶ 52-53.  For the reasons explained below, all these allegations fail to state a claim under N.C.G.S. § 75-41.

A.   **The Times's Presentation of the Automatic Renewal Clause Was Clear and Conspicuous.**

Perkins's Section 75-41(a)(1) claim fails as a matter of law because The Times did just what that section requires: provide the automatic renewal clause in a "clear and conspicuous" manner.

1.   A Disclosure Is "Clear and Conspicuous" When a Reasonable Consumer Would Have Noticed and Understood It.

Section 75-41(a)(1) requires that, for a contract that automatically renews unless the consumer cancels, the automatic renewal clause must be disclosed "clearly and conspicuously in the contract or contract offer."  N.C.G.S. § 75-41(a)(1).  Whether a disclosure is sufficiently conspicuous is a question of law.  *See Strubel v. Capital One Bank (USA), N.A.*, 179 F. Supp. 3d 320, 325 (S.D.N.Y. 2016) ("Conspicuousness is a question of law 'not because judges are experts at graphic design, but because subjecting conspicuousness to fact-finding would introduce too much uncertainty into the drafting process.'" (quoting *In re Bassett*, 285 F.3d 882, 885 (9th Cir. 2002))); *see also* N.C.G.S. § 25-1-201(b)(10) ("Whether a term is 'conspicuous' or not is a decision for the court.").

Although the ARS does not expressly define "clear and conspicuous" and no court has yet interpreted it in the context of this statute, the phrase has a well-defined meaning that must be applied here.  When interpreting a statute, North Carolina law states that "[c]ourts must always accord words undefined in a statute their plain and definite meaning when the statutory language is clear and unambiguous."  *Spruill v. Lake Phelps Volunteer Fire Dep't Inc.*, 523 S.E.2d 672, 675 (N.C. 2000) (cleaned up); *see generally Partita Partners LLC v. United States*, 216 F. Supp. 3d 337, 339 (S.D.N.Y. 2016) (Castel, J.) (conducting the same plain meaning analysis under federal

9

law).  This rule is based on the presumption that, in enacting new laws, "the Legislature is presumed to have used the words of a statute to convey their natural and ordinary meaning." *Perkins v. Ark. Trucking Servs., Inc.*, 528 S.E.2d 902, 904 (N.C. 2000).  Courts may determine the "ordinary meaning" of words by "look[ing] to dictionaries."  *Id*.

Under the phrase's plain meaning, a disclosure is "clear and conspicuous" if it is set forth in express written language that a reasonable consumer would have noticed and understood.  *See* Black's Law Dictionary (11th ed. 2019) (defining "clear" to mean "free from doubt, sure, unambiguous" and "conspicuous" in the context of "a term or clause" as "clearly visible or obvious," which "depends on the size and style of the typeface"); *see also* Oxford English Dictionary (2021-22), available at www.oed.com (defining "clear" as it pertains to "words [and] statements" as "easy to understand, fully intelligible, free from obscurity of sense, perspicuous"; defining "conspicuous" in relevant part to mean "clearly visible, easy to be seen, obvious or striking to the eye").  And because this language is unambiguous, the statutory construction inquiry ceases here.  *See Spruill*, 523 S.E.2d at 675.

Even if it were necessary to delve further, this result is entirely consistent with how North Carolina's General Assembly has defined "clear and conspicuous" elsewhere.  For example, N.C.G.S.  § 25-1-201(b)(10) incorporates U.C.C.  § 1-201(10), which, in turn, defines "conspicuous" as "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it."  It is also consistent with how courts in North Carolina have interpreted the phrase "clear and conspicuous" in the context of other North Carolina statutes and federal law.  *See, e.g.*, *Hardison v. Kia Motors Am., Inc.*, 738 S.E.2d 814, 817 (N.C. Ct. App. 2013) (concluding that disclosures on pages 43-47 of a car manual were "clear and conspicuous" under the New Motor Vehicles Warranties Act, N.C.G.S. § 20-351, because they were unambiguous and

in a clearly marked section); *Fort v. First Citizens Bank & Trust Co.*, 526 F. Supp. 22, 27 (M.D.N.C. 1981), *aff'd*, 673 F.2d 1309 (4th Cir. 1981) (holding that disclosures were "clear and conspicuous" as a matter of law under the federal Truth in Lending Act, noting that the phrase does not mean that information must be presented "more conspicuous[ly] than other items," but only that "a reasonable person would notice it").[7]

> 2.   Perkins's Own Allegations Show That a Reasonable Consumer Would Have Noticed and Understood the Automatic Renewal Clause.

Applied here, Perkins fails to allege any basis to infer that a reasonable consumer would ***not*** have noticed and understood the automatic renewal clause.   According to Perkins, the Checkout Page does not clearly and conspicuously "present the complete 'automatic renewal offer terms'"[8] required by N.C.G.S. § 75-41(a)(1) because the terms were "presented in the same size, color, and font as that of the surrounding block of text," "placed alongside other, unrelated disclosures without distinction from the surrounding text," and appeared far from the "Purchase Subscription" button, and thus could be "easily overlooked."   Compl. ¶ 25.   But as shown below, the Checkout Page—both as represented in the Complaint's excerpts and in its complete form— belies these allegations, showing that any reasonable person would have seen and understood these terms.   *See* Compl. ¶ 22; Chesley Decl., Ex. A.

---

[7] New York courts have used a similar interpretation of the phrase "clear and conspicuous."  *See, e.g.*, *Meyer v. Uber Technologies*, 868 F.3d 66, 77 (2d Cir. 2017) (concluding that a hyperlink to the defendant's Terms of Service provided "clear and reasonably conspicuous" notice of arbitration requirement); *Scott v. Palermo*, 233 A.D.2d 869, 869 (4th Dep't 1996) (holding that a contractual provision limiting consequential damages was "clear and conspicuous" where a typical purchaser would understand it).

[8] N.C.G.S. § 75-41(a)(1) requires disclosure of "the automatic renewal clause."  The "automatic renewal offer terms" language used in the Complaint appears to have been taken from the *Moses* Complaint, which used the language of the California automatic renewal law.  *See Moses* FAC ¶ 22 (quoting Cal. Bus. & Prof. Code § 17602(a)(1)-(3)).   Unlike California, however, North Carolina does not require any specific elements to be included in the automatic renewal disclosure.

*First*, the automatic renewal clause is unambiguous and easy to understand.  Under the all-caps, bolded heading "**PAYMENT INFORMATION**," the text clearly states that the "payment method will be automatically charged $4.00 every 4 weeks for the first year" and "$17.00 every 4 weeks thereafter," specifies the date on which the price will increase, and explains that the "subscription will continue until you cancel."  Compl. ¶ 22; Chesley Decl., Ex. A.  Moreover, immediately above the button that a user must click to purchase a subscription, the text again notifies a would-be buyer that "Your subscription will renew automatically, and you will be charged in advance."

*Second*, the automatic renewal clause appears in a location where it is likely to command attention.  The price and duration of a subscription appear immediately to the right of where customers are required to input their payment information—not in a distant location where they could easily scroll past it without stopping on that part of the page.  In addition, while Perkins claims that the terms are "placed alongside other, unrelated disclosures," Compl. ¶ 25, the only text above the clause is a single sentence about what the subscription includes and the price of the subscription—arguably the most relevant and important information.  Chesley Decl., Ex. A.  The only text below indicates that sales tax may apply and restates the purchase price.  In short, the placement of the automatic renewal clause makes it obvious and easy to see when users input their payment information to purchase a subscription.

*Third*, the clause is distinctly highlighted on a minimalist and uncluttered page.  It is set off on the top right side of the page and framed with a gray box.  *See* N.C.G.S. § 25-1-201(b)(10)(b) (explaining that setting language off from surrounding text and using "marks that call attention" are examples of "conspicuous terms").  It is also contained within a pair of horizontal lines that emphasizes its importance, and—as noted above—follows a bolded header that says "**PAYMENT**

**INFORMATION**," which draws attention to the section in a conspicuous way.  *See id.* § 25-1-201(b)(10)(a) (noting that "[a] heading in capitals" indicates a "conspicuous" disclosure).  And although Perkins complains about the placement of the financial terms near the payment box, she ignores that The Times's second reminder that "Your subscription will renew automatically" is placed immediately above the "Purchase Subscription" button—the very location where she admits a consumer will see it before making a purchase.  *See* Compl. ¶ 22.

Given these facts, The Times clearly and conspicuously disclosed its automatic renewal clause and cannot be liable under N.C.G.S. § 75-41(a)(1).

**B.    The Times's Presentation of the Cancellation Terms Was Clear and Conspicuous.**

Similarly, Perkins's claim pursuant to N.C.G.S. § 75-41(a)(2) fails as a matter of law. Section 75-41(a)(2) provides that "how to cancel the contract" must be "clearly and conspicuously" disclosed "in the initial contract, contract offer, or with delivery of products or services."  N.C.G.S. § 75-41(a)(2).  Thus, unlike N.C.G.S. § 75-41(a)(1), information about how to cancel need not be provided before a contract is executed.  Here, The Times clearly and conspicuously disclosed how to cancel the contract in the initial contract, both during the checkout process ***and*** with delivery of products or services.

Perkins's conclusory assertion that The Times violated this subsection by giving its subscribers "no explanation of *how* to cancel" is, again, undercut by her own screenshot of the Checkout Page, along with sections of her contract that she has omitted.  *See* Compl. ¶ 22; Chesley Decl., Exs. A, B.  Immediately beneath the "Purchase Subscription" button, the Checkout Page contains a bolded, blue hyperlink to the Cancellation Policy and informs the subscriber that the policy's terms will govern the cancellation process.  This link was displayed clearly and conspicuously, as it was placed in a prominent area and was rendered in bold and in blue, a format

13

that is widely used to signal the presence of a hyperlink. *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 840 (S.D.N.Y. 2012) (noting with approval prior case law stating that "blue hyperlinks" "should be treated the same as a multipage written paper contract" because "a person using a computer quickly learns that more information is available by clicking on a blue hyperlink" (quoting *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 121 (Ill. App. Ct. 2005))); *see generally* N.C.G.S. § 25-1-201(b)(10)(b) (displaying text "in contrasting type, font, or color to the surrounding text of the same size" is one way to make a disclosure clear and conspicuous).

Because subscribers agreed to the Cancellation Policy when they purchased their subscriptions, these terms became part of the "initial contract" within the meaning of N.C.G.S. § 75-41(a)(2). *See Braswell Egg Co. v. Poultry Mgmt. Sys., Inc.*, 481 F. Supp. 3d 528, 540 (E.D.N.C. 2020) (explaining that under North Carolina law, when "a contract expressly incorporates a document by reference," "that document becomes a part of the parties' agreement" even if a party "signs [the] written contract without reading it"); *see also Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 78-80 (2d Cir. 2017) (holding that the plaintiff agreed to Uber's Terms of Service where they were hyperlinked on a sign-up page that stated "by creating an Uber account, you agree to the Terms of Service"). Here, the Cancellation Policy—to which Perkins affirmatively agreed—provides clear, detailed instructions on how to cancel. *See* Chesley Decl., Ex. B. Specifically, in a section entitled "Cancellations and Refunds of Digital Subscriptions," the policy tells subscribers when they can cancel ("any time"), when that cancellation becomes effective ("at the end of your current billing period"), how to cancel by telephone (including the phone number), and how to cancel via online chat (including a link to the chat feature). *Id.* § 2.1.

And even if the Cancellation Policy was not expressly incorporated into a subscriber's contract (which it is), by providing access to that policy both during the sign-up process and

14

afterward, The Times satisfied Section 75-41(a)(2) by explaining how to cancel "with delivery of products or services."  In fact, the Complaint notes that, after a subscriber gains access to The Times's website by purchasing a digital subscription, they have access to a Help article in which The Times clearly sets forth the various ways to cancel a membership.  *See* Compl. ¶¶ 26-27 & n.18.  Perkins asserts that the Help article cannot satisfy the ARS because it is accessible only "*after* completing the checkout process," Compl. ¶ 27, but ignores that Section 75-41(a)(2) can be satisfied by providing cancellation terms "with delivery of products or services"—here, the online delivery of Perkins's digital subscription to The Times.  And in any event, the Help article referenced in the Complaint *is* available at any time to anybody, regardless of whether they have a Times subscription, a fact that this Court can verify simply by clicking on the hyperlink in the Complaint.  *Id.* at 13  n.18  (citing  *Cancel  Your  Subscription*,  N.Y.  Times, https://help.nytimes.com/hc/en-us/articles/360003499613-Cancel-Your-Subscription).[9]  The easy accessibility of The Times's cancellation procedures further demonstrates why their disclosure was conspicuous.  *See Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-cv-04570, 2017 WL 7309893, at *10 (S.D.N.Y. Nov. 20, 2017) (explaining that a website user's ability to access the relevant terms at any point before or after purchase via Google search or the website's landing page and read them at her leisure, with no time limit and the ability to easily "zoom[] in on the language," contributed to the terms' conspicuousness).

### C.     The Notification Required by N.C.G.S. § 75-41(a)(3)-(4) Does Not Apply to Monthly Subscriptions.

Perkins also alleges that The Times violated Sections 75-41(a)(3) and 75-41(a)(4), which provide certain notification requirements for automatic renewal periods longer than 60 days.

---

[9] The Court may take judicial notice of this webpage, which is incorporated by reference in the Complaint.  *See* p.8 & n.3, *supra*.

Given this timing requirement, these provisions have no relevance to the monthly subscription at issue here. *See* Compl. ¶ 34 (alleging that Perkins had a "monthly digital NYT subscription").

The text of N.C.G.S. § 75-41(a)(3) is unambiguous on this point, providing that its requirements apply only to "any automatic renewal *exceeding 60 days*." (emphasis added).[10] As the Complaint acknowledges, monthly subscriptions like Perkins's, by definition, renew each month—a period of no more than 31 days. *See* Compl. ¶ 20 (noting that Perkins's subscription renewed "at the end of the initial one-month period").

Similarly, Section 75-41(a)(4), which describes the requirements for "the notification" required in Section 75-41(a)(3), does not apply to monthly subscriptions. The text of Section 75-41(a)(4) states that persons must "disclose the changing terms of the contract clearly and conspicuously on *the notification* in at least 12 point type and in bold print." N.C.G.S. § 75-41(a)(4) (emphasis added). It is plain that "the notification" in this clause is a reference to the "written notice" required by Section 75-41(a)(3), which is to be delivered "by personal delivery, electronic mail, or first-class mail."[11] Nothing else in Section 75-41 discusses a specific notice or

---

[10] This 60-day time period was a deliberate choice by the General Assembly. An earlier draft of Section 75-41(a)(3) applied to subscriptions of more than 30 days. *See* An Act to Provide Further Regulatory Relief to the Agricultural Community, Senate Bill 770, Proposed Committee Substitute S770-PCS15378-TQxf-37 (May 25, 2016), https://webservices.ncleg.gov/ViewBillDocument/ 2015/7607/0/S770-PCS15378-TQxf-37. But the General Assembly revised the proposed bill to lengthen the time period to 60 days. *See id.*, Proposed Committee Substitute S770-PCS45526-TQxf-41 (June 15, 2016), https://webservices.ncleg.gov/ViewBillDocument/2015/7903/0/ S770-PCS45526-TQxf-41; *see also* Exhibit 2, Senate Finance Committee Analysis of Proposed Committee Substitute ("PCS") to Senate Bill 770 (June 15, 2016) (stating that the PCS would change the bill to "make[] automatic renewal notification requirements applicable to contracts exceeding 60 days, rather than 30 days"). It is easy to understand why the General Assembly would make this choice, given that consumers would likely consider monthly reminder emails or letters to be a nuisance.

[11] This interpretation is further bolstered by the fact that font sizes are typically measured in "points" for "items on a printed page" like an email or a letter, not websites. *See, e.g.*, "Point (typography)," Wikipedia, https://en.wikipedia.org/wiki/Point_(typography) (last accessed September 7, 2022). In any case, Perkins was well-aware of the changing terms of her monthly

16

notification.  Instead, the other subsections concern disclosures in a contract, contract offer, or with delivery of products or services.  *See* N.C.G.S. § 75(a)(1)-(2).

Legislative history also supports this reading of these subsections.  Subsections (a)(3) and (a)(4) were not part of the original ARS law when it was enacted in 2007.  Instead, they were added to the statute at the same time in 2016, through the very same amendment.  *See* An Act to Provide Further Regulatory Relief to the Agricultural Community, S.L. 2016-113, § 16.(a) https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2015-2016/SL2016-113.pdf. Thus, it makes sense that they be read together, to require that a notification be sent to subscribers between 15 and 45 days before their subscriptions automatically renew (a timeframe that would make no sense if they needed to be sent each month) and then set forth various requirements for the content and format of that notice.  *See* N.C.G.S. § 75-41(a)(3)-(4).

Put simply, the statutory text and legislative history permit only one conclusion: Sections 75-41(a)(3) and (a)(4) apply only to automatic renewal clauses with renewal periods exceeding 60 days, not to Perkins's monthly subscription.

Given her failure to plausibly allege any violation of the ARS, Perkins's ARS claim should be dismissed.

## II.   PERKINS FAILS TO STATE AN UNFAIR AND DECEPTIVE TRADE PRACTICES CLAIM.

Although Perkins styles the second count of her Complaint as a claim for "Unfair and Deceptive Trade Practices" ("UDTPA"), she fails to plead the necessary allegations to support that claim.  Perkins does not even mention North Carolina's statute prohibiting unfair and deceptive trade practices, which is codified at N.C.G.S. § 75-1.1, nor does she allege that The Times's actions

---

renewal, as the terms were clearly and conspicuously disclosed on the Checkout Page when she signed up for her subscription.

have "the tendency to deceive," "offend[] established public policy," or are "immoral, unethical, oppressive, unscrupulous, or substantially injurious to customer." *See Waddell v. U.S. Bank Nat'l Assoc.*, 395 F. Supp. 3d 676, 684 (E.D.N.C. 2019) (internal citations omitted).  She also fails to properly plead causation or explain why she incurred damages when The Times provided her with the services that she paid for.  *See id.* (listing the elements of a claim under Section 75-1.1, which includes that "the act proximately caused injury to the plaintiff").  The UDTPA claim should be dismissed.

### A.   Perkins Has Not Alleged an Unfair or Deceptive Trade Practice.

Instead of attempting to show that The Times's actions were unfair or deceptive, Perkins merely alleges that The Times "violated the provisions of N.C.G.S. Chapter 75; specifically, N.C.G.S. § 75-41," seemingly based on the mistaken belief that a violation of Section 75-41 is a *per se* violation of Section 75-1.1.  Compl. ¶ 60.  But as the North Carolina Court of Appeals has explained, a violation of a regulatory statute is a *per se* violation of Section 75-1.1 only if "the regulatory statute ***specifically*** defines and proscribes conduct which is unfair or deceptive within the meaning of [Section 75-1.1]." *Noble v. Hooters of Greenville (NC), LLC*, 681 S.E.2d 448, 454 (N.C. Ct. App. 2009) (emphasis added).  Section 75-41 does not do so; instead, it states that failing "to comply with the requirements of this section is in violation of ***this section***"—not Section 75-1.1.  N.C.G.S. § 75-41(c) (emphasis added).

Moreover, unlike many other sections of Chapter 75, Section 75-41 does ***not*** include language stating that a violation of its terms also constitutes a violation of Section 75-1.1. *Compare, e.g.*, N.C.G.S. § 75-41, *with id.* § 75-20(d) (expressly stating that a violation of § 75-20, which bars the delivery of unsolicited checks, is an "unfair trade practice under G.S. 75-1.1" that "is subject to all of the enforcement and penalty provisions of an unfair trade practice under this

Article").[12]   Where, as here, "[t]he General Assembly has specifically provided that certain violations" within a statutory chapter are unfair or deceptive acts, courts have concluded that the omission of "a similar provision" in a particular section of that chapter means "that the General Assembly did not intend for violations of [that section] to be *per se* violations of N.C.G.S. § 75-1.1."[13]   *Odell v. Legal Bucks, LLC*, 665 S.E.2d 767, 780 (N.C. Ct. App. 2008).   Thus, it is unsurprising that there do not appear to be any cases in which a North Carolina court held that a violation of Section 75-41 was a *per se* violation of Section 75-1.1.   *See generally Cross v. Ciox Health, LLC*, 438 F. Supp. 3d 572, 586-87 (E.D.N.C. 2020) (declining to "expand North Carolina law" to create a *per se* violation of Section 75-1.1 that has not been recognized by the North Carolina Supreme Court or Court of Appeals).

Because Perkins's UDTPA claim rests solely on the fallacy that a violation of Section 75-41 is a *per se* UDTPA violation, it must be dismissed.

**B.   Perkins Has Not Alleged Proximate Cause.**

Perkins has also failed to allege facts establishing proximate cause as required to establish a UDTPA claim.   While Perkins's claim appears to be based on vaguely described omissions from the Checkout Page, she has not alleged these omissions with particularity or claimed that she

---

[12] *See also* N.C.G.S. §§ 75-29(b), 75-38(a), 75-39(c), 75-40(f), 75-42(e), 75-43(d), 75-56(a), 75-62(d), 75-63(q), 75-63.1(g), 75-64(f), 75-65(i), 75-118(e), 75-122, 75-128, 75-135(c).

[13] To the extent that the ARS statute is ambiguous on this point (and it is not), legislative history confirms that a violation of § 75-41 does not automatically constitute an unfair or deceptive trade practice because language to that effect was cut from the final version of the statute.  *See* An Act To Require Businesses that Sell Products or Services to Consumers Pursuant to Contracts that Automatically Renew Unless the Consumers Cancel the Contracts To Disclose the Renewal Clauses And, For Contracts That Automatically Renew for More than One Month, To Notify the Consumers in Writing Prior to the Cancellation Deadline in the Automatic Renewal Clause, Senate Bill 527, § 1, https://www.ncleg.gov/Sessions/2007/Bills/Senate/PDF/S527v1.pdf (March 6, 2007) (proposing that Section 75-41(d) provide that "[a] violation of this section is an unfair trade practice under G.S. 75-1.1").

reasonably relied on any of them.  *See Cross*, 438 F. Supp. 3d at 584-85 (explaining that a plaintiff must allege reasonable reliance on any alleged misrepresentations or omissions and must do so with the specificity required under Rule 9(b)).

As Perkins's own pleadings show, all material information about Perkins's subscription was provided on the Checkout Page.  The Checkout Page discloses the monthly subscription charge for the first year, along with the increased monthly charge thereafter.  Compl. ¶ 22.  The Checkout Page also discloses that the subscription will renew automatically and that it will renew until she cancels.  *Id.*  The Checkout Page further discloses—in two places—that she can cancel at any time.  *Id.*  The Checkout Page also provides a web link to the Terms of Sale and the Cancellation Policy.  *Id.*

Based on all this, Perkins cannot plausibly claim that she, or any reasonable person in her position, would be unaware that she had enrolled "in an 'automatic renewal' program under which the subscription would renew each month at varying rates unless [she] chose to cancel."  *Id.* ¶ 37; *see, e.g.*, *Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404, 411-12 (E.D.N.C. 2015) ("[R]eliance is unreasonable as a matter of law where a plaintiff relies upon a representation 'directly contrary' to the express terms of a written contract.") (collecting cases).  Because Perkins identifies no other alleged misrepresentation or omission (and certainly fails to do so with the specificity Rule 9(b) requires), she cannot show that she reasonably relied on, and thus suffered any injury, as a proximate result of any alleged misrepresentation or omission.[14]

---

[14] To the extent Perkins contends that the Checkout Page was deceptive or unfair because she had to access more detailed terms and cancellation procedures through a link, her reliance would be unreasonable as a matter of law.  *See Solum*, 147 F.3d at 412.  That is because where, as here, "a plaintiff 'could have discovered the truth about the misrepresentation upon inquiry,' a plaintiff must 'allege that it was denied the opportunity to investigate or could not have learned the true facts by exercise of reasonable diligence."  *Id.* at 411.  Perkins, of course, could have learned more about the cancellation policies simply "by reading" the Terms of Service and the Cancellation

C.      **Perkins Is Not Entitled to Treble Damages Under N.C.G.S. § 75-16.**

Rather than discussing the substantive elements of a UDTPA claim, Perkins focuses solely on Section 75-16.  Compl. ¶¶ 61-63.  As a threshold matter, this claim should be dismissed because Section 75-16 does not create a distinct cause of action.  *See Bumpers v. Cmty. Bank of N. Va.*, 695 S.E.2d 442, 448 (N.C. 2010), *abrogated on other grounds by Duncan v. Duncan*, 742 S.E.2d 799 (N.C. 2013) (explaining that "a claim for attorney fees under section 75-16.1 is not a substantive issue, or in any way part of the merits of a claim under section 75-1.1").  And even if Perkins had adequately alleged that she incurred any damages (which she has not), Section 75-41(e) provides the exclusive remedy for a violation of Section 75-41: a declaration that "the automatic renewal clause [is] void and unenforceable."  Because she has not stated an independent claim for relief under Section 75-1.1, her remedy (if any) is limited to the one the General Assembly provided in Section 75-14(e).

Of course, because Perkins has failed to allege any valid claims, she is not entitled to any remedy at all.

III.    **PERKINS FAILS TO STATE AN UNJUST ENRICHMENT CLAIM.**

Perkins bases her unjust enrichment claim on the premise that The Times "realize[d] substantial revenues from selling" Perkins a subscription that she "did not intend to renew." Compl. ¶¶ 67-68.  It would be "inequitable," she alleges, for The Times "to retain the benefits" of her subscription payments under these circumstances.  *Id.* ¶ 68.[15]

---

Policy.  *Id.* at 413.  Additionally, as Perkins's own allegations show, *see*, *e.g.*, Compl. ¶ 25 & n.18, "with minimal research, [she] could have discovered" the Cancellation Policy on The Times's website.  *Solum*, 147 F.3d at 413.

[15] Several of Perkins's allegations in support of her unjust enrichment claim make little sense in the context of the remainder of her pleading.  She alleges, for example, that The Times's conduct violates "state and federal law by automatically renew[ing] subscriptions without written notice." Compl. ¶ 65.  However, it is not clear—and she does not say—what state or federal law she is

Perkins's claim fails at the outset because, as Perkins repeatedly acknowledges (*see, e.g.*, Compl. ¶¶ 3-4, 24-33, 39, 45, 53), the parties' relationship was governed by the contract they formed when Perkins became a subscriber.  *See Booe v. Shadrick*, 369 S.E.2d 554, 555-56 (N.C. 1988); *see also Krawiec v. Manly*, 811 S.E.2d 542, 551 (N.C. 2018) (explaining that an unjust enrichment claim exists only "without an express contract").

Even if there were no valid contract between Perkins and The Times, Perkins's unjust enrichment claim would still fail.  "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor."  *Atl. Coast Line R.R. Co. v. State Highway Comm'n*, 150 S.E.2d 70, 73 (N.C. 1966).  Recovery for unjust enrichment, therefore, is premised on "the equitable principle that a person should not be permitted to enrich himself unjustly at the expense of another."  *Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.*, 712 S.E.2d 670, 676 (N.C. Ct. App. 2011) (quoting *Allgood v. Wilmington Savs. & Trust Co.*, 88 S.E.2d 825, 829 (N.C. 1955)).  A plaintiff is entitled to recover on this ground only when "equity and good conscience" justify requiring defendant to pay plaintiff.  *Id.*

Here, there is nothing "unjust" about The Times receiving money in exchange for giving Perkins (and the other subscribers in the putative class) access to The Times's vast repository of digital content.  The subscribers paid, and The Times gave them access, just as it promised.  Both parties received something in return for what they gave.  *See McCabe v. Abbott Lab'ys Inc.*, 47 F.

---

referring to.  In addition, although she alleges that she brings claims "on behalf of [her]self and consumers nationwide," *id.* ¶ 64, her class definition mentions only a class of North Carolina residents, *id.* ¶ 40.  The Times notes that these exact same allegations appear, verbatim (including typos), in the Complaint in *Leak*.  *See Leak* Compl. ¶¶ 32-33.

Supp. 3d 339, 349 (E.D.N.C. 2014) (dismissing an unjust enrichment claim because an employer was not unjustly enriched by an employee "performing the job she was paid a salary to perform").

Indeed, Perkins "seem[s] to have it backwards." *Sullivan v. Lab'y Corp. of Am. Holdings*, No. 17-cv-193, 2018 WL 1586471, at *6 (M.D.N.C. Mar. 28, 2018) (rejecting an unjust enrichment claim where, as here, the defendant provided the services at issue). There is no allegation that The Times did not provide the access to digital content that was promised. Thus, if Perkins were to obtain the relief she seeks here—a refund of her subscription charges—then she, not The Times, would be unjustly enriched. This claim should be dismissed.

## CONCLUSION

For the reasons stated above, The Times's motion to dismiss should be granted, and the Complaint should be dismissed with prejudice.

Respectfully submitted this 9th day of September, 2022.

<div style="margin-left:40%;">

/s/ Karen A. Chesley
Karen A. Chesley
David McCraw
The New York Times Company
620 Eighth Avenue
New York, NY 10018
Tel: 800-698-4637
karen.chesley@nytimes.com
david.mccraw@nytimes.com

*Attorneys for Defendant*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 9, 2022, the foregoing Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Karen A. Chesley
Karen A. Chesley
The New York Times Company
620 Eighth Avenue
New York, NY 10018
Tel: 800-698-4637
karen.chesley@nytimes.com

*Counsel for Defendant*

24