UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MEGAN PERKINS, on behalf of herself and all
others similarly situated,

                             Plaintiff,                    22-cv-5202 (PKC)

        -against-                      OPINION AND ORDER

THE NEW YORK TIMES COMPANY, d/b/a
The New York Times,

                             Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiff Megan Perkins, a citizen of North Carolina, asserts that The New York Times Company (the "Times") does not adequately disclose subscription-renewal terms to consumers who sign up for digital subscriptions, in violation of North Carolina's Automatic Renewal Statute, N.C.G.S. § 75-41(a) (the "ARS").  She asserts that, without her knowledge and consent, the Times automatically renewed her subscription 23 times, resulting in unauthorized charges totaling $136.  She brings this action as a putative class action.  Subject matter jurisdiction is premised on the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A).[1]

        The Times moves to dismiss the Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P.  The Complaint and the Times's motion raise issues of statutory construction that have not been addressed in the courts of North Carolina or elsewhere as to the application of the ARS, which was enacted in 2007, amended in 2016, and seems to be seldom cited or litigated.

---

[1] The Times is alleged to be a New York corporation with its principal place of business in New York.  The Complaint alleges that there are more than 100 class member that the aggregate damages exceed $5 million, exclusive of interest and costs.  (Compl't ¶ 7.)

The ARS requires a subscription offeror to "clearly and conspicuously" advise a subscriber of specific renewal terms.  For reasons that will be explained, the Court concludes that the Complaint plausibly alleges that the Times did not give clear and conspicuous notice of methods for canceling a subscription and also failed to identify subscription rate increases in a bolded typeface.  Thus, the Complaint plausibly alleges violations of two ARS subsections, N.C.G.S. § 75-41(a)(2), (4).  It otherwise fails to plausibly allege a claim for relief.  Thus, the motion to dismiss will be granted in part and denied in part.

BACKGROUND.

Perkins purchased a monthly digital Times subscription through the Times website on or about February 28, 2020.  (Compl't ¶ 34.)  She alleges that she was located in North Carolina at the time.  (Id.)  She subscribed at a promotional rate of $4 a month and provided her PayPal account information to the Times.  (Id.)

The Complaint asserts that before she completed the order, "the relevant screens and buttons presented to Ms. Perkins did not clearly and conspicuously state that her [Times] Subscription would automatically renew every month until she cancelled, and they did not describe the full cancellation policy that applied to her purchase."  (Id. ¶ 35.)  Perkins asserts that after she completed her order, the Times sent an email acknowledging that her subscription was activated, but the email did not set forth the complete terms of renewal or cancellation.  (Id. ¶ 36.)  Due to the purportedly deficient disclosures, Perkins asserts that she was unaware that she had enrolled in an "automatic renewal" program under which her subscription would renew each month at variable rates.  (Id. ¶ 37.)

On February 24, 2021, about a year after she began her subscription, Perkins's monthly subscriber fee doubled from $4 to $8.[2]  (Id. ¶ 38.)  She asserts that the Times did not provide her with timely notice of the February 24, 2021 renewal.  (Id. ¶ 39.)  Perkins asserts that her subscription was renewed "an additional twenty three times for a total of eleven unauthorized charges amounting to $136 to Ms. Perkins's PayPal account without her knowing consent."  (Id. ¶ 40.)

Perkins asserts the Times violates all four subsections of the ARS, N.C.G.S. § 75-41(a), by failing to adequately disclose various subscription-renewal terms in a manner required by the statute.  (Compl't ¶¶ 24-33.)  The Complaint brings one claim under the ARS, one claim of unfair and deceptive trade practices under North Carolina law, N.C.G.S. § 75-16, and one claim of unjust enrichment.  (Compl't ¶¶ 52-70.)[3]

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678.  Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may

---

[2] Screenshots from April 2020 submitted by Perkins indicate a monthly fee increase to $17, not $8.  (Compl't ¶¶ 22, 32.)  The Complaint tacitly acknowledges the discrepancy and explains that "exact costs on other dates may vary . . . ."  (Id. ¶ 21 n.17.)
[3] In its memorandum, the Times makes much of a prior action that Perkins brought against the Times in North Carolina, which she voluntarily dismissed, and asserts that she has engaged in forum shopping.  (Def. Mem. 1, 6-7.)  The Times does not assert that the existence of the now-dismissed prior action provides a ground for dismissal.  The history of the North Carolina proceeding plays no role in deciding this motion.

take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

DISCUSSION.

> I.    The Motion to Dismiss Perkins's Claim under the ARS Will Be Granted in Part and Denied in Part.

> A.    Overview of the ARS.

Perkins asserts that the Times violated four subsections of the ARS by providing insufficient automatic-renewal disclosures on its checkout page.  The ARS requires that certain disclosures be made by "[a]ny person engaged in commerce that sells . . . or offers to sell . . . any products or services to a consumer pursuant to a contract, where the contract automatically renews unless the consumer cancels the contract . . . ."  N.C.G.S. § 75-41(a).  The seller must "clearly and conspicuously" disclose "the automatic renewal clause," how the consumer can cancel the contract, and, if the terms change upon automatic renewal, explain so in bolded typeface at least 12 points in size.  Id. § 75-41(a)(1), (a)(2), (a)(4).  It also specifies disclosures for "any automatic renewal exceeding 60 days . . . ."  Id. § 75-4(a)(3).

The ARS became effective on October 1, 2007.  Subsections (a)(3) and (a)(4) were added as part of a 2016 amendment.  See 2016 North Carolina Laws S.L. 2016-113 (S.B. 770).  Neither party has cited authority that applies or interprets the ARS.  The statute's Notes of Decision, as maintained on Westlaw, lists no authorities, and the Court has been unable to locate any decision of a North Carolina court or a court applying North Carolina law that cites the ARS.[4]  While California has an oft-litigated automatic-renewal statute, Cal. Bus. & Prof. Code §

---

[4] A two-sentence Order in Color Masters Painting, Inc. v. Balboa Capital Corporation, 5:16-cv-287-D (E.D.N.C.) (ECF 50), denied defendant's motion for judgment on the pleadings directed to an eight-count amended complaint

17602, its provisions vary significantly from the North Carolina law, and decisions applying it are of limited persuasive value here.

Given the apparent absence of controlling or persuasive precedent, the Court's analysis is based on the plain language of the statute and the facts alleged in the Complaint, and endeavors to predict how North Carolina's highest court would apply the ARS to Perkins's claims.  See, e.g., Runner v. New York Stock Exch., Inc., 568 F.3d 383, 386 (2d Cir. 2009) (a court exercising diversity jurisdiction "must carefully predict how the state's highest court would resolve the uncertainties" of interpreting that state's laws) (quotation marks omitted); Audler v. CBC Innovis Inc., 519 F.3d 239, 248 (5th Cir. 2008) ("Because CAFA is based on diversity jurisdiction, state substantive law governs the determination of whether [the] petition states a claim for relief.").

Under North Carolina Law, a court "must always accord words undefined in a statute their plain and definite meaning when the statutory language at issue is clear and unambiguous."  Spruill v. Lake Phelps Volunteer Fire Dep't, Inc., 523 S.E.2d 672, 675 (N.C. 2000); see also Perkins v. Arkansas Trucking Servs., Inc., 528 S.E.2d 902, 904 (N.C. 2000) ("Nothing else appearing, the Legislature is presumed to have used the words of a statute to convey their natural and ordinary meaning.") (quotation marks omitted).  "'However, this Court does not read segments of a statute in isolation.'  We similarly do not read portions of a sentence in isolation."  Matter of J.E.B., 853 S.E.2d 424, 429 (N.C. 2021) (quoting Rhyne v. K-Mart Corp., 549 S.E.2d 1, 20 (N.C. 2004)).  "Individual expressions must be construed as a part of the composite whole and be accorded only that meaning which other modifying provisions and the

---

that asserted, among other things, that renewal provisions in defendant's lease agreements were not clear and conspicuous (ECF 13 ¶ 42).  Neither the Order nor the Amended Complaint in Color Masters cited the ARS.

clear intent and purpose of the act will permit."  State v. Farook, 871 S.E.2d 737, 751 (N.C.

2022) (quotation marks omitted).

> B.  The Complaint Does Not Plausibly Allege
>      a Violation of Subsection 75-41(a)(1).

The ARS provides that the offeror of a subscription must "[d]isclose the

automatic renewal clause clearly and conspicuously in the contract or contract offer."  N.C.G.S.

§ 75-41(a)(1).  The Complaint acknowledges that the Times's subscriber-checkout page includes

an automatic-renewal clause, but asserts that it is not "clearly and conspicuously" displayed.

(Compl't ¶ 25.)

The ARS does not define "clearly and conspicuously."  As noted, if the legislature

leaves a term undefined, it "is presumed to have used the words of a statute to convey their

natural and ordinary meaning," Perkins, 351 N.C. at 638, but the words must be "accorded only

that meaning which other modifying provisions and the clear intent and purpose of the act will

permit," Farook, 381 N.C. at 186.

The parties point to dictionary definitions of the word conspicuous.  Black's Law

Dictionary (11th ed. 2019) defines "conspicuous" as "clearly visible or obvious."  "Whether a

printed clause is conspicuous as a matter of law depends on the size and style of the typeface."

Id.  The online Oxford English Dictionary's primary definition defines conspicuous as "[c]learly

visible, easy to be seen, obvious or striking to the eye," and, secondarily, as "[o]bvious to the

mental eye, plainly evident; attracting notice or attention, striking; hence, eminent, remarkable,

noteworthy."[5]  In Webster's Third New International Dictionary (2002), the definitions include

"1: obvious to the eye or mind: plainly visible" and "2: attracting or tending to attract attention

by reason of size, brilliance, contrast, station."

---

[5] See https://www.oed.com/view/Entry/39762

The primary definitions require conspicuous text to be "obvious" or "plainly" evident and visible.  The secondary definitions emphasize attention-drawing, visual-design elements.  A conspicuous provision would be obvious or plainly visible to a person reviewing a contract or contract offer, and not require that person to pore over the text of an agreement to find the particular provision in a sea of text.  The Court does not conclude that a conspicuously displayed provision must always include attention-getting attributes such as size, brilliance or contrast, but such features may be useful in context, particularly in a dense, multi-paragraph text, where essential provisions could end up buried and unnoticed amid the fine print.

The Complaint includes the following screenshot of the subscriber-checkout page:

(Compl't ¶ 22.)[6]

The subscription checkout page, as reproduced in the Complaint, can fairly be characterized as free of visual clutter and containing limited text.  The page includes a short, four-sentence paragraph above the "Purchase Subscription" button, and, on the right side of the page, five paragraphs, each containing one or two sentences.  The checkout page twice advises the consumer of automatic renewal: above the checkout button, it states, "Your subscription will renew automatically, and you will be charged in advance[,]" and in the right column, states, "Your subscription will continue until you cancel."  (Id.)

Perkins asserts that the automatic-renewal term is not "clearly and conspicuously" displayed because it is not presented in an offsetting size, color or font from the surrounding text, and therefore is "easily overlooked."  (Id. ¶ 25; Opp. Mem. at 5.)  While such formatting may enhance the conspicuousness of the text, the legislature did not specify a formatting requirement in subsection (a)(1).  This contrasts with subsection (a)(4), which requires at least a 12-point typeface and bolded text.  North Carolina's codification of the UCC also specifies certain visual enhancements for "conspicuous" text, N.C.G.S. § 25-1-201(b)(10), which are not mandated by the ARS.  Perkins's argument would read, as a matter of law, certain typeface and design elements into the definition of "conspicuous" that the legislature opted not to incorporate into section (a)(1).

Perkins also urges that the automatic-renewal language is not conspicuous because it is not in close proximity to the "Purchase" button.  (Opp. Mem. at 7.)  But unlike its California counterpart, the ARS does not have a proximity requirement.  See Cal. Bus. & Prof.

---

[6] Paragraph 32 contains a similar screenshot.

Code § 17602(a)(1).  Even if it did, text directly above the "Purchase" button advises that "[y]our subscription will renew automatically . . . ."  (Compl't ¶ 22.)

The subscription-checkout page, as it is depicted in the body of the Complaint, contains a few short paragraphs of plainly visible text, and it twice advises that a subscription will automatically renew until it is canceled, including once above the checkout button.  In this context, the Complaint does not plausibly allege why the automatic-renewal provision was not clearly and conspicuously presented and why its terms would not be obvious or plainly visible to a consumer.  It relies on a proposed definition of conspicuous that goes beyond the word's plain and ordinary meaning, and would require specific design elements not adopted by the legislature.

The Times's motion to dismiss will therefore be granted as to Perkins's claim under subsection 41(a)(1).

### C.  The Complaint Plausibly Alleges a Violation of Subsection 75-41(a)(2).

Subsection 41(a)(2) of the ARS requires a seller to "[d]isclose clearly and conspicuously how to cancel the contract in the initial contract, contract offer, or with delivery of products or services."  The Complaint asserts that the Times checkout page states only that a subscriber "may cancel at any time" and does not explain how to cancel a subscription.  (Compl't ¶ 26.)  The Complaint asserts that a consumer cannot access the details of the Times's cancellation policy until completing the checkout process and agreeing to subscribe.  (Id. ¶ 27.)

The Complaint plausibly alleges that the Times does not clearly and conspicuously disclose how to cancel a subscription.  The subscriber checkout page advises the consumer that a subscription may be canceled at any time but does not explain how to do so.  Text above the checkout button states in part: "By subscribing, you agree to the Terms of Sale, including the Cancellation and Refund Policy."  (Id. ¶ 22.)  The Times notes that the phrase

"Cancellation and Refund Policy" appears in blue boldface, signaling to a consumer that it is a hyperlink to that policy, and that the contents of such hyperlinks are understood to be similar to a multipage written contract.  (Def. Mem. at 13-14.)  The Times also has submitted a copy of the cancellation policy as it existed on or around February 20, 2020.[7]  (Chesley Dec. ¶ 6 & Ex. B.)  As submitted by the Times, the cancellation policy is printed on two pages, contains four subparts and twelve paragraphs.  (Id. Ex. B.)  The policy states that a subscriber may cancel by calling a listed "Customer Care" number or clicking a link to "chat[ ] with us."  (Id.)

Assuming that the bolded, blue hyperlink to the Cancellation and Refund Policy is in clear and conspicuous text, the policy that it links is a multi-paragraph explanation that lists a cancellation phone number in the second paragraph and also states that cancellation is available through online chat.  As submitted by the Times, the methods for cancellation are not highlighted and do not stand out from the dense, surrounding text.  Perkins has plausibly alleged that the methods for canceling a Times subscription are not clearly and conspicuously disclosed to the consumer.

The Times also notes that subsection 41(a)(2) does not strictly require advance notice of cancellation methods and states that methods may be disclosed with the "delivery of products or services."  (Def. Mem. at 14-15.)  But in order to understand how to cancel a subscription, a consumer would need to proactively search for this policy and scrutinize several blocks of text.

---

[7] As a document linked from the subscriber checkout page, the cancellation policy is incorporated into the Complaint by reference and may be considered on this motion.  See, e.g., Nicosia v. Amazon.com, Inc., 834 F.3d 220, 234 (2d Cir. 2016).

Because the Complaint plausibly alleges that the Times did not clearly and conspicuously disclose how to cancel a subscription in a manner required by the ARS, its motion to dismiss Perkins's claim brought under subsection 41(a)(2) will be denied.

### D.  Perkins Acknowledges that She Has Not Stated a Claim under Subsection 75-41(a)(3).

Subsection (a)(3) governs "any automatic renewal exceeding 60 days," for which the seller must give written notice "stating the date on which the contract is scheduled to automatically renew and notifying the consumer that the contract will automatically renew unless it is cancelled by the consumer prior to that date."  N.C.G.S. § 75-41(a)(3).

The Complaint asserts that the Times violated subsection 41(a)(3) by "failing to provide written notice for any automatic renewal exceeding 60 days . . . ."  (Compl't ¶¶ 24, 28-30, 53.)  The Complaint does not identify an automatic renewal that exceeded 60 days.

In her opposition brief, Perkins acknowledges that subsection (a)(3) is inapplicable to her subscription.  (Opp. Mem. at 12.)  Her claim under subsection (a)(3) is deemed voluntarily dismissed.

### E.  The Complaint Plausibly Alleges a Violation of Subsection 75-41(a)(4).

Subsections (a)(3) and (a)(4) were added to the ARS as part of a 2016 amendment.[8]  The Times urges that subsection (a)(4) should therefore be applied in tandem with subsection (a)(3), and that (a)(4) is addressed only to the contents of a notice for an automatic renewal that exceeds 60 days.  Accordingly, because Perkins does not allege an automatic renewal that exceeds 60 days, the Times urges that she cannot seek relief under subsection (a)(4).

---

[8] See https://webservices.ncleg.gov/ViewBillDocument/2015/7903/0/S770-PCS45526-TQxf-41 at p. 14.

The Court concludes the Times's reading of subsection (a)(4) is strained and the Complaint plausibly states a claim for relief under (a)(4).

Subsection (a)(4) states: "If the terms of the contract will change upon the automatic renewal of the contract, disclose the changing terms of the contract clearly and conspicuously on the notification in at least 12 point type and in bold print." N.C.G.S. § 75-41(a)(4).

The Times urges that "the notification" referenced in (a)(4) is the same "written notice" specified in (a)(3), and that the requirements of (a)(4) therefore apply only to notices of automatic renewal for subscriptions that exceed 60 days. (Def. Mem. at 16-17.) The Times points out that no other subsections of the ARS refer to a written notice or notification, and that "it makes sense" that (a)(3) and (a)(4) should be "read together" because they were enacted as part of the same 2016 amendment. (Id.) But subsections (a)(4) and (a)(3) do not expressly reference one another. Each is a subsection of section 75-41(a) that refers to contracts "where the contract automatically renews unless the customer cancels the contract . . . ." The references to "the contract" in subsection (a)(4) is to the contract described in subsection (a).

The Times's construction of subsection (a)(4) lacks support in the statutory text. If "the notification" of subsection (a)(4) were intended to be part of the "written notice" of (a)(3), the legislature would have said so by referencing it. That the legislature approved two subsections during the same amendment process does not alone suggest that they should be read as a unified provision. The two subsections are presented as different and independent subsections of the ARS. See Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 344 (2005) ("Each clause is distinct and ends with a period, strongly suggesting that each may be

understood completely without reading any further."). The Court concludes that the Times's proffered construction lacks merit.

Subsection (a)(4) requires that, if the terms of a contract change upon automatic renewal, the changed terms must be clearly and conspicuously displayed in a notice with at least 12-point type and bold print. N.C.G.S. § 75-41(a)(4). Perkins asserts the Times checkout page does not comply with subsection (a)(4) because it does not display in bold, 12-point type the change to her subscription upon automatic renewal. (Compl't ¶¶ 31-33.) Under the bolded, capitalized heading "**PAYMENT INFORMATION**", the checkout page states that the subscriber's account will be charged $4 every four weeks for the subscriber's first year. (Id. ¶¶ 22, 32.) "It will then be automatically charged $17.00 every 4 weeks thereafter, starting on April 5, 2021 ($4.25 per week)." (Id.) The Complaint states that "[s]uperficially" this language is not "clear and conscious [sic]" because it is not bolded and in 12-point type. (Id. ¶ 32.)

The Complaint plausibly alleges that the Times checkout page did not satisfy the requirements of subsection (a)(4) because the sentence describing the subscription price increase is not bolded and in 12-point type. As the Times notes, the statute's requirement of a 12-point type is difficult to apply as to a website because a consumer using a phone or desktop browser generally tailors on-screen text size to a personal preference, as opposed to printed materials, where a publisher alone controls the type size and style. (Def. Mem. at 16 n.11.) At this stage, the Court need not decide how the 12-point type requirement of section (a)(4) applies to a digital platform because, at the very least, the text was not offset in bold type, as the statute requires.

Because Perkins plausibly alleges that the Times did not notify her of changes in subscription-renewal terms using a bolded typeface, the motion to dismiss her claim under subsection (a)(4) will be denied.

F.  Plaintiff's Article III Standing.

The Times does not raise the issue of Perkins's Article III standing, but the Court

has a duty to raise an issue that could impact the Court's subject matter jurisdiction.  In

TransUnion LLC v. Ramirez, 141 S. Ct. 2190 (2021), the Supreme Court held that a plaintiff

bringing a claim in federal court under a consumer-protection statute must ultimately

demonstrate a "concrete harm" arising from a defendant's failure to satisfy formatting or

disclosure requirements.  "[T]he TransUnion decision substantially and materially changed a

district court's analysis of Article III standing in statutory consumer law cases."  Ciccone v.

Cavalry Portfolio Servs., LLC, 2021 WL 5591725, at *3 (E.D.N.Y. Nov. 29, 2021) (Seybert, J.)

(quotation marks omitted); see also Carter v. Scripps Networks, LLC, 2023 WL 3061858, at *2-3

(S.D.N.Y. Apr. 24, 2023) (summarizing Article III standing in light of TransUnion).

The Complaint alleges that, based on "missing and otherwise deficient

disclosures," Perkins was unaware that she enrolled in an automatic-renewal subscription, which

included eleven unauthorized charges amounting to $136.  (Compl't ¶¶ 37, 40.)  At the pleading

stage, the Complaint adequately alleges that Perkins was concretely harmed when she

unwittingly enrolled in an automatically renewing subscription, causing her to be charged $136.

However, to have Article III standing, she ultimately must prove that any alleged

non-compliance with the ARS caused her to suffer a concrete harm, and not merely point to

technical deficiencies under the statute.  See TransUnion, 141 S. Ct. at 2206 (plaintiff does not

have Article III standing when a claim "is merely seeking to ensure a defendant's compliance

with regulatory law.") (quotation marks omitted).  "Plaintiffs must maintain their personal

interest in the dispute at all stages of litigation" and "must demonstrate standing for each claim

that they press . . . ."  Id. at 2208 (quotation marks omitted).  Thus, Perkins must ultimately prove

that she actually suffered a concrete harm because the Times did not clearly and conspicuously state how to cancel a subscription under subsection (a)(2) and did not identify in boldface the terms required under subsection (a)(4).

II.   The Complaint Does Not Identify
      Unfair and Deceptive Trade Practices.

Count Two of the Complaint asserts a claim of unfair and deceptive trade practices under North Carolina law, citing to N.C.G.S. § 75-16.  (Compl't ¶¶ 58-63.)  Section 75-16 states in relevant part: "If any person shall be injured . . . by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict."

Section 75-16 is purely a remedial statute, not a substantive one.  "Before a plaintiff may avail itself of the Act's remedies, it must prove that a defendant's conduct falls within the statutory framework allowing recovery."  White v. Thompson, 691 S.E.2d 676, 679 (N.C. 2010) (quotation marks omitted).  On its face, the text of section 75-16 would appear to broadly allow for an award of treble damages based on any violation of Chapter 75, but the courts of North Carolina award treble damages only where the plaintiff has proved unfair or deceptive conduct.  See, e.g., Jones v. Harrelson & Smith Contractors, LLC, 670 S.E.2d 242, 251 (N.C. Ct. App. 2008) ("A[n] [unfair and deceptive trade practices] claim is a substantive claim, the remedy for which is treble damages."); United Roasters, Inc. v. Colgate-Palmolive Co., 485 F. Supp. 1049, 1058 (E.D.N.C. 1980) (section 75-16 "is punitive in nature" and treble damages can be awarded only if the plaintiff demonstrates intentional deception).  "[D]amages for unfair and deceptive trade practices under North Carolina law are awarded as a penalty rather than to

compensate." Johnson v. Colonial Life & Acc. Ins. Co., 618 S.E.2d 867, 872 (N.C. Ct. App. 2005).[9]

Unfair or deceptive trade practices are made unlawful by N.C.G.S. § 75-1.1. Violations of some consumer-protection statutes also violate section 75-1.1 as a matter of law. See Noble v. Hooters of Greenville (NC), LLC, 681 S.E.2d 448, 454 (N.C. Ct. App. 2009). Many sections of Chapter 75, not including the ARS, expressly provide that a violation of their terms also violates section 75-1.1. N.C.G.S. §§ 75-20(d), 75-29(b), 75-38(a), 75-39(c), 75-40(f), 75-42(e), 75-43(d), 75-56(a), 75-62(d), 75-63(q), 75-63.1(g), 75-64(f) (incorporating 75-1.1 and allowing treble damages under 75-16 only in limited circumstances); 75-65(i); 75-118(e); 75-122; 75-128; 75-135(c). Other claims may fall within section 75-1.1 if they effect an unfair or deceptive practice on the consuming public. See, e.g., White, 676 S.E.2d at 108-09 (breach of fiduciary duty claim against a business partner implicated a deception on the consuming public, entitling plaintiff to treble damages under section 75-16).

The text of section 75-41 does not reference section 75-1.1, and its only express remedy provides that a violation of the ARS "renders the automatic renewal clause void and unenforceable." N.C.G.S. § 75-41(e).

"'[U]nder North Carolina law, the conduct sufficient to constitute an unfair or deceptive trade practice is a somewhat nebulous concept, and depends on the circumstances of the particular case,' but only practices involving 'some type of egregious or aggravating circumstances are sufficient to violate the UDTPA.'" Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 164 (4th Cir. 2012) (quoting ABT Building Products Corp. v. Nat'l Union Fire Ins. Co. Of Pittsburgh, 472 F.3d 99, 122 (4th Cir. 2006)). A practice is unfair "when it offends established

[9] Perkins does not dispute that she must prove unfair or deceptive trade practices, though she does argue that section 75-16 is substantive and not solely remedial. (Opp. Mem. at 14-15.)

public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." In re Fifth Third Bank, N.A.-Village of Penland Litig., 719 S.E.2d 171, 176 (N.C. Ct. App. 2011) (quotation marks omitted). "A trade practice is deceptive if it possesse[s] the tendency or capacity to mislead, or create[s] the likelihood of deception." Compton v. Kirby, 577 S.E.2d 905, 917 (N.C. Ct. App. 2003). "A party may be guilty of unfair or deceptive acts or practices when it engages in conduct that amounts to an inequitable assertion of its power or position." Id. (quotation marks omitted). "[B]ecause ordinarily 'unfairness and deception are gauged by consideration of the effect of the practice on the marketplace, it follows that the intent of the actor is irrelevant. . . . What is relevant is the effect of the actor's conduct on the consuming public.'" Nash Hospitals, Inc. v. State Farm Mutual Auto. Ins. Co., 803 S.E.2d 256, 265 (N.C. Ct. App. 2017) (quoting Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981)).

There is some authority requiring a plaintiff in federal court to allege unfair and deceptive trade practices with the particularity of Rule 9(b), Fed. R. Civ. P. Manoula, LLC v. Ohio Security Ins. Co., 2022 WL 129322 (M.D.N.C. Jan. 13, 2022) (collecting cases). Here, however, the claim does not allege supporting facts sufficient to meet the notice pleading required by Rule 8. See, e.g., Palin v. New York Times Co., 940 F.3d 804, 810 (2d Cir. 2019) (to satisfy Rule 8 the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

The Complaint does not identify unethical or oppressive conduct, or describe an inequitable exercise of power by the Times. Accepting the truth of the Complaint's allegations and drawing every reasonable inference in favor of Perkins, the information required by the ARS was easily accessible to Perkins, but because it was not clearly and conspicuously displayed, it

required her to click through a link to locate methods for canceling a subscription, and, separately, she did not observe the non-bolded text on the checkout page stating that after approximately a year, her subscription price would increase.  (Compl't ¶¶ 26-27, 32.)  These allegations go toward the formatting of readily available and easily discovered information, and do not describe a deception or the concealment of renewal policies.

Immoral or inequitable conduct on the part of the Times is loosely referenced. Perkins asserts a "systematic[]" violation of the ARS and a "dark pattern" requiring "several complex procedures to do simple things."  (Compl't ¶¶ 4, 18.)  But it does not allege that Perkins was misled or deceived into subscribing.  She has merely alleged that relevant language was not conspicuously displayed in formats required by the ARS, causing her to be "unaware" that renewal rates increased after a year.  (Compl't ¶ 37.)  This does not plausibly describe an egregious or aggravating circumstance.  See Belk, 679 F.3d at 164.

Because the Complaint does not allege egregious or inequitable conduct, the motion to dismiss Perkins's claim of unfair or deceptive trade practices under section 75-16 will be granted.

III.     The Unjust Enrichment Claim Will Be Dismissed.

Count Three brings a claim of unjust enrichment.  (Compl't ¶¶ 64-70.)  It asserts that the Times violated state and federal law by automatically renewing Perkins's subscription without written notice and inequitably retained financial benefits from the renewal of her subscription.[10]  (Id. ¶¶ 66-69.)  Perkins seeks disgorgement and restitution.  (Id. ¶ 70.)

The unjust enrichment claim is not pleaded in the alternative and it expressly incorporates the Complaint's preceding allegations.  (Id. ¶ 64.)  Perkins's ARS claim asserts the

---

[10] The Complaint makes no other reference to a violation of federal law and no federal law is specified.

existence of a subscription contract, and the Complaint repeatedly describes her Times
subscription as being created through contract.  (Id. ¶¶ 3-4, 24, 31, 33, 39, 53.)  The assertion in
the unjust enrichment claim that the Times violated state law by automatically renewing her
subscription (id. ¶ 66) impliedly incorporates the ARS claim.

"In order to recover on a claim of unjust enrichment, a party must prove that it
conferred a benefit on another party, that the other party consciously accepted the benefit, and
that the benefit was not conferred gratuitously or by an interference in the affairs of the other
party."  Southeastern Shelter Corp. v. BTU, Inc., 572 S.E.2d 200, 206 (N.C. Ct. App. 2002).  An
unjust enrichment claim "is neither in tort nor contract but is described as a claim in quasi
contract or a contract implied in law.  . . .  If there is a contract between the parties the contract
governs the claim and the law will not imply a contract."  Booe v. Shadrick, 369 S.E.2d 554, 556
(N.C. 1988).

Accordingly, North Carolina courts will dismiss an unjust enrichment claim that
is already governed by a contract.  See, e.g., Southeastern Shelter Corp., 572 S.E.2d at 207
("Since a contract exists between the parties, the law will not imply a contract.  Therefore,
plaintiffs may not maintain a claim for unjust enrichment."); Krieger v. Johnson, 2014 WL
1759054, at *2 (N.C. Super. Ct. Apr. 30, 2014) ("A claim for unjust enrichment is properly
dismissed where the complaint reveals the existence of a contract between the parties.");
McManus v. GMRI, Inc., 2012 WL 2577420, at *10 (W.D.N.C. July 3, 2012) ("because all of
the facts pleaded by Plaintiff allege the existence and validity of a contract between the parties,
Plaintiff's claim for unjust enrichment must fail as a matter of law.").

Because the unjust enrichment claim is not pleaded in the alternative and seeks
relief based on activities already governed by contract, the claim will be dismissed.

CONCLUSION.

The motion to dismiss is DENIED as to claims asserted in Count One under

N.C.G.S. § 75-41(a)(2) and (a)(4).  The claim under section 75-41(a)(3) is voluntarily dismissed.

The motion is GRANTED as to the remainder of Count One and the entirety of Count Two and

Count Three.

The Clerk is respectfully directed to terminate the motion.  (ECF 22.)

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
        May 23, 2023